# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3207

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the District of |
| | * | Minnesota. |
| Lyle Robert Paton, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: April 14, 2008
Filed: July 28, 2008

_____

Before LOKEN, Chief Judge, JOHN R. GIBSON and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Lyle Robert Paton conditionally pled guilty to five counts of production of child pornography, reserving the right to challenge the district court's[1] denial of his motion to suppress the images of child pornography seized from his home during the execution of a search warrant. The district court sentenced Paton to life in prison. On appeal, Paton challenges the denial of his motion to suppress and argues his sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment. We affirm.

_____

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

I.    Background

On July 7, 2006, a concerned citizen called the St. Paul, Minnesota, Police Department to report suspicious activity at Lilydale Park.  St. Paul Police Officer Colleen Lesedi responded to the call and met with the citizen.  The citizen reported she had observed an adult male with a digital camera heading into the woods with five boys, one of whom was smoking.  She explained the man looked suspicious and was shabbily dressed and commented that the boys did not look like they were having a good time.  The woman described the boys' body language as "off."  Officer Lesedi told the citizen she would head into the woods to try to find the group.

Officer Lesedi parked her patrol car behind the car the man with the five boys had driven to the park.  She entered the woods and eventually encountered the group from behind.  One of the boys noticed Officer Lesedi approaching and tapped the man on the shoulder.  In a non-confrontational and cheerful manner, Officer Lesedi asked the group what they were doing in the woods.  One boy responded that they were looking for fossils.  Officer Lesedi asked if they had found any fossils, and the boy responded that they had not.  Officer Lesedi followed up by asking if the boys were part of a summer class, and the boys indicated they were not; they identified the man they were with as a friend of the family.  The boys appeared on edge and evasive in their responses.  The adult male did not respond to the officer, except for occasionally shaking his head.  Officer Lesedi noted the man's clothes—a buttoned up short-sleeved shirt, tan pants, and beat up dress shoes.  She found this attire ill-suited to the stated purpose of walking in the woods looking for fossils, as Lilydale Park lacked paved trails and it was a particularly hot day.  Upon Officer Lesedi's inquiry, the man identified himself as Lyle Robert Paton.  Officer Lesedi noticed Paton was carrying a digital camera.  Officer Lesedi told the group to "have a good day," and she walked out of the woods.

After she exited the woods, Officer Lesedi called to check on Paton's criminal history.  She learned that Paton was a registered sexual predator with two prior offenses: one involving child pornography and one for criminal sexual conduct in the third degree involving a juvenile male.[2]  Officer Lesedi called for backup.

Paton emerged from the woods while Officer Lesedi was on the telephone. Paton, walking by himself, did not attempt to make contact with Officer Lesedi. Paton waited for the boys to exit the woods.  Before the boys emerged from the woods, Officer Lesedi called out to Paton and asked him to "wait."  The boys eventually exited the woods, walking slowly, and they waited by Paton's car without speaking to either Paton or Officer Lesedi.

St. Paul Police Officer Mitchell Schuck arrived in a second squad car.  After conferring with Officer Lesedi, Officer Schuck approached Paton.  Officer Schuck explained to Paton that he needed to search his person for officer safety.  Paton consented to the search; Officer Schuck did not locate any weapons.  It was a very hot day, and Paton indicated he was not feeling well.  Officer Schuck asked Paton to sit in the back of Officer Lesedi's squad car, which is air conditioned, to continue their conversation.  Officer Schuck informed Paton that he was not under arrest, and Paton agreed to sit in the car to answer some questions.

During their conversation in the squad car, Officer Schuck noticed Paton was no longer carrying a digital camera.  Officer Schuck asked Officer Lesedi about the camera's location, and Officer Lesedi reported she was unaware the camera was missing. Officer Schuck then asked Paton about the camera, and Paton explained that he "got scared" and discarded the camera in the weeds near the entrance to the woods. Paton offered to show the officer where the camera was located, but Officer Schuck

---

[2] In fact, Paton has three prior convictions related to sexual exploitation of children.  See infra Section II.C.

declined, preferring to use the police dog who had recently arrived on the scene along with other officers. The dog located the camera about fifty yards from the path's entrance to the woods and roughly ten feet from the path. The camera's memory card door was open, and the digital memory card was missing. Officer Schuck asked Paton about the memory card, and Paton stated the card was in his wallet. Officer Schuck retrieved the card from Paton's wallet with his permission. The card appeared "ripped or chewed up," "as if someone had been picking it apart with their fingernail."

Officers asked the boys about their time in the woods with Paton. The boys stated that Paton took three pictures of each of them while they were holding a fossil. None of the boys indicated anything was amiss; none reported having had pornographic pictures taken. While speaking with Officer Schuck, Paton denied taking any pictures of the boys while they were in the woods.

Officers contacted Paton's wife, Helen Brown Bruce, the registered owner of the car Paton had driven to the park. Bruce voiced concerns about her husband's presence at the park with young boys. Bruce consented to a search of her car, and officers drove her to the park. At the park, Bruce stated she did not recognize any of the boys with her husband. When the police searched Bruce's car, they found a second digital memory card. Eventually, Paton and Bruce left the park together.

On July 14, 2006, a nurse at the Midwest Children's Resource Center in St. Paul interviewed two of the boys who had been in the woods with Paton. The nurse interviewed the boys, identified as R.T. and S.C., separately, and the boys did not have the opportunity to consult with each other between interviews. R.T. stated that Paton had taken multiple nude pictures of him over a two-year period and reported that Paton took similar pictures of other boys. He described Paton taking boys to the woods or other secluded locations to take nude photographs or film nude movies. He explained that Paton gave the children clothing, shoes, toys, and video games in exchange for allowing him to take the photographs or film the movies. In addition to

the photographing and filming, R.T. stated Paton had attempted to touch and rub his penis. S.C. provided a similar account of exploitation by Paton. S.C. said that over the course of two years Paton had taken nude photographs of him and given him gifts in return.

On July 17, 2006, Sergeant Julie Harris of the St. Paul Police Department applied for a warrant to search Paton's home, person, and vehicle. The search warrant application included details about the encounter with Paton in Lilydale Park and the statements made by R.T. and S.C. The application did not include any information about images found on the digital memory card recovered from Paton's wallet or the card found in the car Paton drove to the park. Sergeant Harris, a ten-year veteran with the St. Paul Police Department and a member of the department's Sex Crimes Unit, included details about her background and experience, as well as information about crimes involving the sexual exploitation of children she had gained through her training and experience.

A state court judge issued the warrant, and officers executed it on July 19, 2006. Among other items, officers recovered a digital memory card containing 114 nude images of five male children. In ten of these images, the children were engaged in sexually explicit conduct. In forty of the images, the children were touching each other, though not in the genital area. The images included pictures of two of the five boys who had been in Lilydale Park with Paton on July 7. Based on this evidence, a federal grand jury charged Paton with five counts of producing child pornography and one count of possessing child pornography. Each of the five counts of production of child pornography relates to a different victim.

Paton filed a motion to suppress evidence, alleging that his Fourth Amendment rights were violated during his detention in Lilydale Park on July 7 and when the warrant was executed on July 19. A magistrate judge recommended the district court

deny the motion, and the district court adopted the recommendation, excluding one part not relevant to this appeal.

Subsequently, Paton pled guilty to the five production counts, pursuant to a plea agreement. In the plea agreement, Paton reserved the right to appeal "the Court's denial of his motion to suppress the images of child pornography seized from the defendant's home on July 19, 2006," and "waive[d] appeal of all other pretrial rulings of the Court." At the plea hearing, Paton requested permission to speak. The court granted his request, and Paton commented that the images of child pornography he produced "were taken in the context of mutual delight."

The probation office prepared a presentence investigation report (PSR) in anticipation of sentencing. The PSR recounted Paton's exploitation of each of the five victims involved in the offenses of conviction, as well as Paton's admissions regarding other incidents of sexual exploitation of minors and the production of child pornography. The PSR also included information about Paton's criminal history, which involved multiple convictions related to sexual abuse of minors and child pornography over the course of twenty-five years. The PSR noted Paton was subject to a 35-year mandatory-minimum term of imprisonment due to his prior convictions. Based on a criminal history category V and a total offense level of 39, and considering the applicable mandatory minimum, Paton's advisory guidelines range was 420 months to life.

At Paton's sentencing hearing, the district court considered the information in the PSR and the factors listed in 18 U.S.C. § 3553(a) in determining the appropriate sentence for Paton. The court sentenced Paton to life in prison. This appeal followed.

II.    Discussion

Paton raises three issues on appeal. First, Paton alleges the district court erred in denying his motion to suppress evidence stemming from events in Lilydale Park. Second, he contends the district court erred in denying his motion to suppress evidence seized from his home pursuant to the search warrant. Third, he argues his sentence of life imprisonment violates the Eighth Amendment's prohibition against cruel and unusual punishment. The government contends Paton's first issue is foreclosed by his plea agreement, while contesting all three arguments on the merits. We conclude the first issue is precluded by Paton's plea agreement, the district court did not err in denying the motion to suppress evidence seized pursuant to the warrant, and Paton's term of imprisonment does not violate the Eighth Amendment.

A.    Evidence Arising from Events in Lilydale Park

Paton raises a number of arguments related to his interaction with St. Paul police officers in Lilydale Park that he claims should have resulted in the suppression of evidence seized that day. He claims he was unconstitutionally subject to arrest without a warrant or probable cause and did not voluntarily consent to the search of his wallet. We agree with the government that these arguments are foreclosed by the terms of Paton's conditional plea agreement entered into pursuant to Federal Rule of Criminal Procedure 11(a)(2).

"Issues concerning the interpretation and enforcement of a plea agreement are reviewed de novo." United States v. Borer, 412 F.3d 987, 994 (8th Cir. 2005). "Where a plea agreement is ambiguous, the ambiguities are construed against the government." United States v. Jensen, 423 F.3d 851, 854 (8th Cir. 2005).

The Federal Rules of Criminal Procedure provide an exception to the general rule that a guilty plea waives all non-jurisdictional defenses. See Fed. R. Crim. P.

11(a)(2) (outlining exception); United States v. Arrellano, 213 F.3d 427, 430 (8th Cir. 2000) (explaining the general rule). Provided the court and the government agree, a defendant may enter a conditional plea of guilty preserving his right to appeal "an adverse determination of a *specified* pretrial motion." Fed. R. Crim. P. 11(a)(2) (emphasis added). Here, Paton moved to suppress the camera and digital memory card seized on July 7, 2006, in Lilydale Pak and to suppress evidence seized pursuant to the search warrant executed on July 17, 2006. In denying the motion, the court addressed the issues separately, and Paton reserved only "the right to appeal the Court's denial of his motion to suppress the images of child pornography seized from the defendant's home on July 19, 2006." Paton specifically waived "all other pretrial rulings of the Court."

The plea agreement is not ambiguous—it is quite plain. Applying Rule 11(a)(2), the only issue preserved for appeal is the admissibility of the evidence seized on July 17. See United States v. Taylor, 519 F.3d 832, 835 (8th Cir. 2008) (finding appeal waiver foreclosed appeal of alleged due process violation when the plea agreement only provided for the appeal of denial of suppression motion based upon Fourth Amendment grounds and not on due process grounds). Paton offers no analytical linkage between the search or seizure on July 7 and the search of his home on July 17 that would justify consideration of an appeal of the July 7 seizures as part of the preserved appeal issue.[3] Thus, we conclude Paton has waived the issue of whether the items seized on July 7 should have been suppressed.

---

[3] In challenging the evidence obtained pursuant to the search warrant, Paton does not allege that any of the facts included in the warrant application were tainted by the alleged violations of his rights in Lilydale Park. Likewise, we do not find any potential "fruit of the poisonous tree" argument that would link Paton's challenge to the evidence obtained in Lilydale Park with the appeal issue he preserved in his plea agreement. See Wong Sun v. United States, 371 U.S. 471, 488 (1963).

B.     Search Warrant

Paton challenges the denial of his motion to suppress evidence seized from his home. Paton alleges his motion should have been granted because the search warrant lacked probable cause. Specifically, he argues there was not a sufficient nexus between the place to be searched and the items to be seized to justify the issuance of the warrant. We disagree.

We review a district court's factual findings for clear error and its legal determinations de novo. United States v. Hansel, 524 F.3d 841, 845 (8th Cir. 2008). We will affirm the court's denial of the motion to suppress unless the decision "is not supported by substantial evidence on the record; it reflects an erroneous view of the applicable law; or upon review of the entire record, we are left with the definite and firm conviction that a mistake has been made." United States v. Bell, 480 F.3d 860, 863 (8th Cir. 2007) (alteration omitted) (internal quotation omitted).

"A warrant is supported by probable cause if there is a fair probability that contraband or evidence of a crime will be found in the place to be searched." United States v. Thompson, 210 F.3d 855, 860 (8th Cir. 2000) (internal quotation omitted). A magistrate considers the totality of the circumstances in making a probable cause determination, and "a warrant is proper so long as the evidence as a whole creates a reasonable probability that the search will lead to the discovery of evidence." United States v. Chrobak, 289 F.3d 1043, 1046 (8th Cir. 2002) (internal quotation omitted).

The affidavit in support of the warrant to search Paton's home provided sufficient nexus between the location to be searched and the evidence sought. The affiant, Sergeant Harris, was a ten-year veteran of the St. Paul police department with extensive training and experience investigating crimes involving the sexual exploitation of children. In her averments she indicated that she had learned through her training and experience that "digital camera[s], computers and the Internet have

become a common tool for individuals who get sexual gratification from viewing images of children or interacting with minors." She explained that, just as law enforcement officers would expect to find tools of the drug trade—drugs, firearms, drug notes, scales, and drug paraphernalia, for example—in the residence of a suspected drug trafficker, investigators expect to find computer systems and Internet access, among other things, in the home of an individual who is known to get sexual gratification from children. Cf. United States v. Allen, 297 F.3d 790, 794 (8th Cir. 2002) (finding sufficient nexus supported a search of a defendant's home when he possessed materials used to manufacture methamphetamine and had spent a night attempting to procure other precursors). The affidavit also provided the issuing judge with information about Paton's previous convictions related to child exploitation, the events in Lilydale Park, and the statements from two children about Paton taking nude pictures and movies of them over a two-year period. The issuing judge was able to draw reasonable inferences from these facts to conclude that Paton likely possessed digital media in his home and used them in furtherance of his predilection for treating young boys as sexual objects. See Thompson, 210 F.3d at 860 (explaining that "a judge may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant"). The information provided was sufficient to supply a fair probability that such items would be found in Paton's home, which is all that is required. See Chrobak, 289 F.3d at 1046 (finding sufficient nexus for search warrant of a suspected child pornographer's home when the individual's name was connected to an Internet moniker that distributed child pornography and law enforcement confirmed his home address). Based on the totality of the circumstances, the affidavit provided a fair probability that evidence of child pornography would be found in Paton's home, and specifically on digital media within his home.[4] Thus, the district court did not err in denying Paton's motion to suppress.

---

[4] Even if the warrant lacked probable cause, the evidence obtained pursuant to the search warrant would have been admissible against Paton pursuant to the good faith exception under United States v. Leon, 468 U.S. 897 (1984).

C.    Sentence

Paton contends that the district court violated the Eighth Amendment's prohibition against cruel and unusual punishment when it sentenced him to life imprisonment.    We review de novo whether a sentence violates the Eighth Amendment.  United States v. Weis, 487 F.3d 1148, 1151 (8th Cir. 2007).

The Eighth Amendment states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  The Supreme Court has interpreted the Eighth Amendment to prohibit punishment that is "grossly disproportionate" to the offense of conviction.  Solem v. Helm, 463 U.S. 277, 288 (1983). This "narrow proportionality principle" applies to both capital and non-capital sentences.  Harmelin v. Michigan, 501 U.S. 957, 996-97 (1991) (Kennedy, J., concurring); see also Ewing v. California, 538 U.S. 11, 20-24 (2003) (applying the proportionality principles contained in Justice Kennedy's Harmelin concurrence).    However, "'outside the context of capital punishment, *successful* challenges to the proportionality of particular sentences are exceedingly rare.'"  Weis, 487 F.3d at 1153 (quoting Harmelin, 501 U.S. at 1001 (Kennedy, J., concurring)).

"In considering whether a sentence is unconstitutionally disproportionate to a crime, '[w]e first address the gravity of the offense compared to the harshness of the penalty.'"  Id. (quoting Ewing, 538 U.S. at 28).  Paton pled guilty to five counts of production of child pornography, violations of 18 U.S.C. § 2251(a).  Each of the five counts involved a different child victim.  The first nude photographs of the victims were taken when they were between eleven and twelve years old, and each victim was photographed multiple times over the course of a number of years.  Paton admitted taking thousands of nude photographs of these five victims, as well as other boys. The crimes against each victim involved the commission of a sexual act or sexual contact.  The victims were engaged in sexually explicit conduct in ten of the 114

images seized.  Additionally, Paton  molested or attempted to molest at least three of the victims.  Paton performed oral sex on at least two of the boys.

"In weighing the gravity of [Paton's] offense, we must place on the scales not only his current felon[ies], but also his long history of felony recidivism."  Ewing, 538 U.S. at 29.  Paton's history of child exploitation is long and demonstrates an unwillingness or inability to "conform[] to the norms of society as established by its criminal law."  Rummel v. Estelle, 445 U.S. 263, 276 (1980).  Paton was first convicted of a crime involving the sexual exploitation of a minor over twenty years ago.  In 1983, Paton was convicted of mailing obscene material after he sent nude photographs of minors engaged in masturbation and the genital stimulation of others through the United States mail.  Paton took the photographs himself.  Paton was a teacher at the time of the offense, and the children depicted in the photographs were his students.  Paton's second offense of conviction occurred while he was on probation for his first conviction.  In 1985, Paton was convicted of third degree criminal sexual conduct after he paid a 13-year-old boy to be able to perform oral sex on the child on three separate occasions.  In 1995, Paton was convicted of possessing child pornography after he was found in possession of 121 nude photographs of boys. Paton admitted taking some of the photographs himself.

Paton's attempts to minimize the severity of his offenses of conviction is unavailing.  Despite Paton's characterization of his crimes as "not violent" and "a manifestation of the disease of pedophilia," his offenses are very serious.  It is particularly troubling that Paton does not recognize the harm he has caused, as evinced by his description of the photographs as being "taken in the context of mutual delight."  The exploitation of children for the sexual gratification of an adult could not be further from "mutual delight."  Moreover, these five offenses follow upon three prior convictions for offenses involving other young boys.

We compare Paton's offenses with the severity of the sentence imposed. For a defendant with at least two prior convictions related to the sexual exploitation of a minor, § 2251(e) provides a minimum term of imprisonment of thirty-five years and a maximum of life imprisonment for the production of child pornography. After considering the relevant factors listed in 18 U.S.C. § 3553(a), the district court sentenced Paton to life imprisonment on each count. Thus, Paton's sentence, while undoubtedly harsh, is within the statutory range provided by Congress. It is reasonable for Congress to authorize harsher punishments for individuals "who have already been convicted of sexually abusing a minor yet will not or cannot comport their conduct to the dictates of the law." Weis, 487 F.3d at 1154 (internal quotation omitted). Moreover, it is exceedingly rare for a non-capital sentence falling within the authorized statutory range to constitute a violation of the Eighth Amendment. Id.

Considering the severity of Paton's crimes and of his criminal history, this "is not 'the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.'" Ewing, 538 U.S. at 30 (quoting Harmelin, 501 U.S. at 1005 (Kennedy, J., concurring)) (upholding a sentence of 25 years to life against an Eighth Amendment challenge). We conclude Paton's sentence did not violate the Eighth Amendment's prohibition against cruel and unusual punishment.

III. Conclusion

For the forgoing reasons, we affirm the judgment of the district court.

_____