# United States Court of Appeals
### For the Eighth Circuit

_____

No. 15-3461
_____

United States of America

*Plaintiff - Appellee*

v.

Darrell A. Scott

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: June 14, 2016
Filed: August 5, 2016

_____

Before SMITH and GRUENDER, Circuit Judges, and KETCHMARK,[1] District
Judge.

_____

SMITH, Circuit Judge.

---

[1]The Honorable Roseann A. Ketchmark, United States District Judge for the
Western District of Missouri, sitting by designation.

Darrell A. Scott was charged in a nine-count federal indictment.[2] He pleaded guilty to Counts VI–IX but proceeded to a bench trial on Counts I–V. The district court[3] found him guilty of all counts, and, based on Counts I–IX, sentenced him to 768 months' imprisonment. Scott appeals, arguing that (1) there is not sufficient evidence to sustain the verdict of the bench trial, (2) his sentence violates the Eighth Amendment, and (3) the district court imposed a substantively unreasonable sentence. We affirm.

## I. *Background*

We recite the evidence in the light most favorable to the verdict. *See United States v. Stevens*, 439 F.3d 983, 986 (8th Cir. 2006). On August 27, 2011, an individual approached Garrett Davis's red Chevrolet Lumina. The individual pointed a handgun at Davis and threatened to kill Davis if he did not get out of the car. Once Davis had exited, the individual ordered Davis to turn over his earring, money, and cell phone. At the same time, the individual intensified his demands by cycling the action on the handgun, causing the chambered round to eject, and again pointed the gun again at Davis. Davis described the gun as a black, .40 caliber automatic pistol

---

[2]The counts are as follows: Counts I and III: carjacking, in violation of 18 U.S.C. § 2119; Count II: using a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A); Count IV: second or subsequent conviction of using a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(C); Count V: possession of a firearm by a felon (related to the carjackings), in violation of 18 U.S.C. § 922(g)(1); Count VI: possession of a firearm by a felon (related to the drug offenses), in violation of 18 U.S.C. § 922(g)(1); Counts VII and VIII: distribution of heroin, in violation of 21 U.S.C. § 841(a)(1); and Count IX: possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).

[3]The Honorable Henry E. Autrey, United States District Judge for the Eastern District of Missouri.

with an extended magazine.[4] The individual then directed an accomplice who had been hiding behind a dumpster to get into Davis's car and drive off. The individual followed the car, keeping the gun pointed at Davis as he left.

Davis called the police. Officer Ishmael Tyson of the St. Louis Metropolitan Police Department (SLPD) responded to Davis's call. Davis provided Officer Tyson with a "pretty good description" of the two carjackers. At trial, Davis identified Carris King as the individual with the handgun. Davis described King's accomplice as an African-American male who was a "little taller," "heavier," and "darker" complected than King. He also described the accomplice as having a mustache, goatee, and a little beard and wearing a dark-colored shirt. At the scene, Officer Tyson recovered a live Winchester .40 caliber cartridge that had been ejected when King "racked" the gun.

Less than an hour after the Davis carjacking, William and Johnetta Smith were getting into their Dodge Caravan when two individuals in a red Lumina pulled up beside their van. Mrs. Smith was in the driver's seat, and Mr. Smith was in the front passenger seat. The passenger of the Lumina, who Mr. Smith later identified as King, asked Mrs. Smith for directions to I-70. King and the driver then exited the Lumina. The driver approached Mrs. Smith, and King approached Mr. Smith. The driver pointed a gun at Mrs. Smith and ordered her to get out of the van. At the same time, King told Mr. Smith to get out and turn over any money. The driver then got into the van and drove away. King followed in the Lumina.

---

[4]At the bench trial, Davis testified that he knew a "little" about guns. More than likely, Davis meant the gun was a semi-automatic pistol. The government recovered a semi-automatic handgun and did not bring charges for possession of a "machinegun." *See* 26 U.S.C. § 5845 (defining "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, *automatically* more than one shot, without manual reloading, by a single function of the trigger" (emphasis added)).

At trial, Mr. Smith testified that he could see the driver "very clearly" and described the driver as taller, heavier, and darker complected than King. Mr. Smith also described the driver as having a beard and wearing a dark-colored shirt. Although the driver was on the other side of the van and closer to his wife, Mr. Smith stated that he was focused on his wife throughout the ordeal. The driver had a gun pointed at her head and Mr. Smith "was afraid for her health" and "didn't want her to get hurt." He described the gun that the driver had as a black Glock.

Not long after the Smith carjacking, Detective Thomas Mayer, an SLPD officer, encountered the Lumina and began to pursue it. King eventually lost control of the Lumina and crashed. Detective Mayer stated that he got a "good look" at the two occupants of the Lumina. At trial, he identified King as the driver of the Lumina. Detective Mayer exited his squad car, commanding King and his accomplice to show him their hands and exit the vehicle. Both King and his accomplice, who were armed, disobeyed Detective Mayer and tried to flee on foot. Detective Mayer fired two shots, causing the accomplice to drop his weapon inside the Lumina as he fled. King kept his weapon, but Detective Mayer saw it and described it as a "dark-colored semi-automatic pistol." Detective Mayer was unable to apprehend King or his accomplice.

Law enforcement searched the Lumina and recovered a dark-colored Glock Model 27, .40 caliber Smith and Wesson semi-automatic pistol on the front passenger seat. It had one round in the chamber and seven rounds in an extended magazine. Officer Mayer identified the Glock as the same firearm that he saw the accomplice drop into the front passenger seat of the Lumina before fleeing. At trial, Mr. Smith testified that the Glock "look[ed] exactly like" the handgun that the driver had pointed at Mrs. Smith. Davis also identified the Glock as the same firearm that King had pointed at him. The search of the Lumina also turned up a key to the Smiths' home and van as well as a container of change and cassette tapes that had been in the Smiths' van. An evidence technician officer lifted latent fingerprints from the passenger door

-4-

of the Lumina and from the cassette tapes. Law enforcement found the Smiths' van abandoned about a mile from their residence.

Law enforcement apprehended King later that day after receiving information of his involvement in the carjackings. Scott was not arrested for another two years. Detective Mayer explained that when presented with interview opportunities, he would ask individuals about unsolved crimes, including the Davis and Smith carjackings. Detective Mayer testified that in August 2013, an interviewee with knowledge of the carjackings gave him Scott's name. This individual told Detective Mayer that Scott participated in the Davis and Smith carjackings.

Detective Mayer entered Scott's name into a computer database, pulled up a photograph of him, and recognized him as the passenger in the Lumina that he had pursued. He then entered Scott's physical characteristics into the Regional Justice Information System (REJIS). The REJIS assembled a panel of five individuals with similar physical characteristics to Scott and prepared a photographic lineup of those five individuals and Scott. The REJIS randomly positioned Scott's photograph in the lineup. Detective Mayer met with the Smiths to present the photographic lineup. He separated the Smiths, presenting the lineup to them individually. Detective Mayer explained to both of the Smiths that "the individual responsible for your crime may or may not be in these photographs, and you are under no obligation to make a selection just from these six." Mrs. Smith did not hesitate in identifying Scott. Detective Mayer testified that when Mrs. Smith saw Scott's photograph, she "became extremely distraught like it brought back all the memories." Detective Mayer presented the lineup to Mr. Smith in a separate room, and he identified Scott with certainty.

Law enforcement arrested Scott on August 16, 2013. Detective Mayer informed him that his arrest was related to the Davis and Smith carjackings. Scott responded, "I knew this shit was going to catch up to me" and "I thought you all forgot about it

already." Law enforcement also matched Scott's fingerprints with the fingerprints lifted from the Lumina. Scott waived his *Miranda* rights and agreed to talk. He admitted to being with King joyriding in a red Lumina the morning of August 27, 2011, but he disclaimed any responsibility for the carjackings. At the time, Scott was released pending trial on Counts VI–IX, then part of a separate indictment. Detective Mayer was aware of these pending charges, but he did not ask him any questions about them.

Later, a federal grand jury returned a nine-count superseding indictment against Scott. Scott's pending charges were combined with the charges relating to the carjackings. Scott pleaded guilty to Counts VI–IX, but he proceeded to trial on Counts I–V. Scott consented to a bench trial on those charges. Before trial, Scott filed motions to suppress the identification evidence from the photographic lineup and any statements that he made after his arrest on August 16, 2013. The district court denied Scott's motions and, after a trial on Counts I–V, found Scott guilty on all counts. At sentencing, the district court calculated Scott's offense level as 23 and criminal history category as V, yielding a Guidelines range of 84 to 105 months. The court sentenced Scott to 84 months' imprisonment on Counts I, III, V, VI, VII, and VIII, to be served concurrently. Additionally, 18 U.S.C. § 924(c) required the court to impose consecutive sentences of 7 years, 25 years, and 25 years on Counts II, IV, and IX, respectively. Accordingly, the district court sentenced Scott to 768 months' imprisonment.

## II. *Discussion*

Scott argues that (1) there is not sufficient evidence to sustain the district court's verdict, (2) his sentence violates the Eighth Amendment, and (3) the district court imposed a substantively unreasonable sentence.

A. *Sufficiency of the Evidence*

Scott contends that the district court erroneously admitted evidence that prejudiced his defense. He first argues that the photographic lineup was unreliable, and, therefore, the district court should have suppressed the Smiths' identification of him. He next argues that the district court should have suppressed the audio recordings of the statements that he made to law enforcement because he was already under indictment, he had counsel, and law enforcement did not notify his counsel prior to questioning. Scott contends that this amounted to a violation of his Sixth Amendment right to counsel. Without the tainted evidence, Scott avers that the evidence is insufficient to establish that he participated in the carjackings or illegally possessed a firearm. Scott also argues that the government did not present sufficient evidence to prove beyond a reasonable doubt that he participated in the Davis carjacking.

"We review the sufficiency of the evidence after a bench trial in the light most favorable to the verdict, upholding the verdict if a reasonable factfinder could find the offense proved beyond a reasonable doubt, even if the evidence rationally supports two conflicting hypotheses." *United States v. Kain*, 589 F.3d 945, 948 (8th Cir. 2009) (quotation and citation omitted). The government had the burden of proving that (1) Scott took a motor vehicle from the person or presence of another by force and violence or by intimidation; (2) Scott intended to cause death or serious bodily harm; and (3) the motor vehicle had been transported, shipped, or received in interstate or foreign commerce. *See* 18 U.S.C. § 2119.

Scott does not contest elements (2) or (3). Scott only argues that there is no evidence establishing his presence at the Davis carjacking. Scott claims that Davis never saw King's accomplice. The record soundly refutes this claim. Davis provided law enforcement with a description of both King and his accomplice. Davis's description of King's accomplice matched the Smiths' description of King's accomplice. In both instances, the victims separately described the accomplice as wearing a dark-colored shirt and as being a "little taller," "heavier," and "darker"

complected than King. Moreover, the ensuing events further establish Scott's participation in the Davis carjacking. The evidence rationally supports the district court's finding that Scott was King's accomplice during the Davis carjacking.

Scott argues that proof of his participation in the Smith carjacking depends on a constitutionally defective photographic lineup. The Due Process Clause requires suppression of an eyewitness identification "only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Perry v. New Hampshire*, 132 S. Ct. 716, 724 (2012) (citations omitted). Even if such a procedure is used, suppression does not automatically follow. *Id.* Suppression will follow only where the evidence is unreliable. *Id.*

Scott does not address the first step—whether the photographic lineup was suggestive and unnecessary. Scott criticizes the reliability of the evidence, arguing that Detective Mayer used a dated photograph that, combined with the gap in time between the crime and the photographic lineup and the choice of a photographic lineup rather than a live lineup, undermined the evidence's reliability. But *Perry* requires that Scott first show that Detective Mayer used a procedure that was both suggestive and unnecessary. *See id.* Here, Detective Mayer did not employ anything suggestive or unnecessary in the procedure. Detective Mayer used the REJIS to generate the photographic lineup, sequestered the Smiths during the identification process, and informed the Smiths that the individual responsible for the carjacking may or may not be in the lineup. We conclude that the identification evidence from the photographic lineup did not violate Scott's due process rights.

Scott also argues that the district court's verdict rests on his postarrest statements, which he argues the district court should have suppressed. At the time of the statements, Scott was under indictment for separate charges and had appointed counsel. Scott argues that law enforcement violated his Sixth Amendment rights by not notifying his counsel who was representing him in the outstanding indictment.

The Sixth Amendment right to counsel is offense specific. *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). "It cannot be invoked once for all future prosecutions." *Id.* "Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses." *Id.* at 176 (quotation and citation omitted). Because Scott had not been charged with any crimes relating to the carjackings, the Sixth Amendment did not forbid law enforcement from questioning him on the carjackings.

Finally, Scott argues that there is insufficient proof to sustain the gun-related convictions based on the insufficiency of the evidence establishing his participation in the carjackings. We have rejected Scott's argument that there is insufficient evidence establishing his participation in the carjackings, and, therefore, we reject this argument as well and affirm the district court.

B. *Eighth Amendment*

Scott next argues that his 768-month sentence is "cumulative and abrogated [his] rights under the Eighth Amendment of the Constitution." He contends that his sentence "is grossly disproportionate to the offenses that [he] committed" and "contrary to the evolving standards of decency which are the hallmark of our civilized society."

We review constitutional challenges to a sentence de novo. *United States v. Capps*, 716 F.3d 494, 498 (8th Cir. 2013). The Eighth Amendment forbids the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. The Supreme Court has understood this provision to "forbid[] only extreme sentences that are 'grossly disproportionate' to the crime." *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring in part and concurring in judgment) (quoting *Solem v. Helm*, 463 U.S. 277, 288 (1983)). To determine whether a sentence for a term of years is grossly disproportionate, we first compare "the crime committed and the sentence imposed." *Id.* at 1005. In the "rare case" that the threshold comparison "leads

to an inference of gross disproportionality," we are then directed to perform a comparative analysis of the defendant's sentence with sentences received by other offenders in the same jurisdiction and other jurisdictions. *Id.* "It is exceedingly rare for an offense that does not have a capital sentence to violate the Eighth Amendment." *United States v. Wiest*, 596 F.3d 906, 911 (8th Cir. 2010) (citation omitted).

Under 18 U.S.C. § 924(c)(1)(A), Scott's first conviction for a § 924(c) offense required a sentence of not less than seven years. Section 924(c)(1)(C) required a 25-year sentence for each of the subsequent § 924(c) convictions. These sentences must be served consecutively to one another, as well as to Scott's 84-month Guidelines sentence. 18 U.S.C. § 924(c)(1)(D)(ii).

The majority of Scott's argument regarding the constitutionality of his sentence is devoted to comparing his sentence and the sentence that King received in state court. We will not conduct such a comparative analysis, though, unless we determine that "the gravity of the crime, considering the harm caused or threatened to the victim or to society, and the culpability and degree of the defendant's involvement" lead to an inference of gross disproportionality. *Wiest*, 596 F.3d at 911–12 (citation omitted). Scott committed two armed carjackings and placed three individuals in fear of their lives. The physically threatening nature of his crimes, the use of deadly weapons in committing the crimes, and his degree of involvement in the crimes all negate an inference of gross disproportionality. Scott's sentence does not violate the Eighth Amendment.

## C. *Substantive Reasonableness*

Lastly, Scott argues that the district court "disregarded the factors in § 3553(a) and went beyond the pale of federal sentences under § 924(c) offenses."

Where, as here, a defendant does not argue that the district court committed a procedural error, we "move directly to review the substantive reasonableness of [the]

-10-

sentence." *United States v. O'Connor*, 567 F.3d 395, 397 (8th Cir. 2009) (citation omitted). "[W]e apply a deferential abuse-of-discretion standard" "[w]hen we review the imposition of sentences, whether inside or outside the Guidelines range." *United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (en banc) (quotations and citations omitted). "A district court abuses its discretion and imposes an unreasonable sentence when it fails to consider a relevant and significant factor, gives significant weight to an irrelevant or improper factor, or considers the appropriate factors but commits a clear error of judgment in weighing those factors." *United States v. Kreitinger*, 576 F.3d 500, 503 (8th Cir. 2009) (quoting *United States v. Miner*, 544 F.3d 930, 932 (8th Cir. 2008)). We apply a presumption of reasonableness to sentences within the Guidelines range. *United States v. Werlein*, 664 F.3d 1143, 1146 (8th Cir. 2011).

The district court sentenced Scott to 84 months' imprisonment on the non-gun offenses, a sentence at the bottom of the Guidelines range. We presume this sentence to be reasonable, and Scott does not rebut this presumption. He provides no examples of how the district court "disregarded the factors in § 3553(a)." The portion of Scott's sentence mandated by 18 U.S.C. § 924(c) is statutorily required and is not subject to reasonableness analysis. *See United States v. Lee*, 502 F.3d 780, 781 (8th Cir. 2007). The district court did not exercise discretion in imposing the consecutive sentences under § 924(c). Section 924(c) imposes substantial sentences on individuals convicted of multiple gun offenses. As Scott's counsel conceded at oral argument, however, Scott's argument is better addressed by Congress than courts. Scott has not demonstrated that the district court abused its discretion in sentencing him to 768 months' imprisonment.

III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____